# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KIMBERLY CROWTHER,  
      Plaintiff,

    vs

COMMISSIONER OF  
SOCIAL SECURITY,  
      Defendant.

Case No. 1:11-cv-394  
Barrett, J.  
Litkovitz, M.J.

**REPORT AND**  
**RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 7) and the Commissioner's response in opposition (Doc. 10).

## I. Procedural Background

Plaintiff filed an application for DIB in October 2007, alleging disability since October 1,

2004, due to spondylothesis/spinal stenosis/sciatica (back), arthritis (knees), tendonitis (right arm

and shoulder), depression, edema (legs and feet), carpal tunnel (both hands and wrists), and

irritable bowel syndrome.  Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff requested and was granted a *de novo* hearing before administrative law judge (ALJ)

Christopher B. McNeil.  A hearing was held on April 27, 2010, at which plaintiff, a

psychological expert (ME) and a vocational expert (VE) appeared and testified.  On June 4,

2010, the ALJ issued a decision denying plaintiff's DIB application.  Plaintiff's request for

review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Medical Evidence[1]

On September 1, 2004, plaintiff saw her treating physician, Christine Wallace, M.D.,

complaining of moderate to severe low back pain. (Tr. 639). Plaintiff reported that she had

stiffness and pain in her back and that sitting or standing too long was causing her pain. *Id.* Dr.

Wallace noted that plaintiff had an antalgic stance and gait, decreased range of motion in her

spine, and tenderness in her paraspinals muscles in the lumbar area, but no muscle spasm,

deformity, or abnormal curve was noted. (Tr. 640). Plaintiff was diagnosed with lumbago,

advised to limit work and was prescribed steroids, pain medication, and muscle relaxants. *Id.*

Plaintiff returned to Dr. Wallace on September 23, 2004 for follow-up and reported that

her back pain was not improving. Plaintiff explained that any amount of walking, sitting or

standing caused pain. Examination revealed tenderness in the lumbar area and left buttock, her

gait was found to be antalgic with a decreased range of motion in the lumbar area due to pain.

Dr. Wallace diagnosed non resolving lumbago with possible underlying disc disease and ordered

x-rays. (Tr. 622).

On September 24, 2004, an x-ray was taken of plaintiff's lumbar spine which revealed

severe degenerative disc disease at L5-S1; minimal degenerative endplate spurring at L2-3 and

---

[1] There is medical evidence in the record concerning plaintiff's mental and physical health. However, because plaintiff does not allege that the ALJ erred with respect to any finding regarding her mental health records, the following summary pertains exclusively to records of plaintiff's physical health treatment. The Court will otherwise reference the evidence regarding plaintiff's mental health treatment as necessary.

L3-4; severe joint space narrowing and sclerosis at L5-S1; an old bilateral pars defects with Grade I spondylolisthesis; and sclerosis around the pars defects suggesting remote incident. (Tr. 623). Due to the x-ray results, an MRI was ordered. (Tr. 616). The September 29, 2004 MRI of the lumbar spine showed Grade I spondylolisthesis of L5 on S1 with facet arthropathy and suspected spondylolysis defects resulting in significant interspace narrowing, adjacent endplate reactive bone marrow edema and moderate bilateral foraminal narrowing for the L5 nerve roots. (Tr. 315-16).

Plaintiff was placed on four weeks of disability from her job. Dr. Wallace agreed that it would be okay for her to be accessible by phone and email for as needed consultation. (Tr. 618).

On October 1, 2004, Dr. Wallace noted that the MRI showed degeneration in L5-S1 level with some impingement on L5 nerve roots on both sides which were likely causing plaintiff's pain and numbness/tingling in legs. Plaintiff was referred to a neurosurgeon. (Tr. 610-11).

In April 2005, plaintiff consulted with a spine surgeon, Anthony Guanciale, M.D., for a specialized opinion regarding her lower back condition which had not improved despite receiving medicinal therapy and three spinal injections. Plaintiff reported that her initial symptoms began in 1995 when she was involved in a motor vehicle accident. She underwent one year of physical therapy for severe back pain at that time. Her pain then subsided but she would have intermittent flare ups. Plaintiff reported having worsening pain since August 2004, when she had a flare up that was her worst to date. Plaintiff had been unable to alleviate these symptoms since that time, noting that nothing has helped. She reported that she continues to

3

have fairly significant debilitating back pain symptomatology as well as some left achy leg discomfort and pain. Examination revealed that plaintiff had a normal gait; stood with a slight decrease in lumbar lordosis; had tenderness to palpation about the left sciatic notch and paralumbar region; had a marked restriction in her lumbar range of motion - forward flexion to only 40° with back pain extension to 15° with back pain; had a positive straight leg test left; had +5/5 strength throughout without gross deficit; and had normal bilaterally range of motion in her hips. Dr. Guanciale ordered an MRI and blood tests, and opined that plaintiff had a persistent debilitating lumbar/lumbosacral strain, mild lumbar radiculopathy, spondylolisthesis at L5-S1 with a bilateral L5 pars interarticularis defect, and moderate to marked foraminal stenosisis secondary to foraminal distortion. Dr. Guanciale discussed his findings with plaintiff and the possibility of surgical intervention, explaining that surgery may not alleviate all her back pain. (Tr. 1089-91).

Plaintiff underwent a lumbar spine MRI on May 10, 2005 which showed Grade I - II spondylolytic spondylolisthesis L5 on S1 with pseudobulging annulus and secondary bilateral foraminal stenosis; diffuse benign marrow edema in the L5 and S1 vertebrae and equivocal minimal contrast enhancement in the posterior L5-S1 disc space suggestive of low grade reactive (sterile) discitis; and benign fatty replacement diffuse of L3 and L4 vertebrae and patchy L2 vertebrae. (Tr. 309).

When seen on May 12, 2005, Dr. Guanciale diagnosed plaintiff with persistent debilitating lumbar/lumbosacral strain; mechanical lower back pain; mild lower extremity lumbar radiculopathy predominant L5-S1 distribution; 9 mm lumbar spondylolisthesis at the L5-

4

S1 level with what appears to be bilateral L5 pars interarticularis defect although radiographs also showing associated marked bilateral facet arthropathy; bilateral at least moderate, if not moderate to marked foraminal stenosis secondary to foraminal distortion, degenerative change, spondylolisthesis and associated pseudo disc protrusion; complaints of persistent debilitating pain, symptomatology worsening over 10 years now and not responding to conservative treatment; abnormal marrow signal about the L3 and L4 vertebral bodies; fatty infiltration diffusely of L3 and L4 vertebra as well as patchy L2 appearing to be benign in nature; and Grade I-II lumbar spondylolisthesis deformity at the L5-S1 level with significant bilateral foraminal compromise. (Tr. 1086). Based upon the foregoing, Dr. Guanciale recommended a staged anterior surgery and then, only if necessary at a later date, possible posterior lumbar partial reduction of deformity fusion stabilization procedure at the L5-S1 level. (Tr. 1086-87). Dr. Guanciale discussed the procedures in detail with plaintiff, including possible operative complications, neurological risks, and expected postop course, and explained that the surgery may not alleviate all of her back and leg symptomologies. *Id.*

On September 27, 2006, plaintiff underwent a consultative examination with Alan Kohlhaas, M.D. (Tr. 1077-79). Dr. Kohlhaas' report recounts plaintiff's history of lower back and bilateral lower extremity pain, her history of treatment, and a review of prior MRIs. (Tr. 1077-78). Dr. Kohlhaas noted that plaintiff had not had any medical evaluations in at least 10 months and that she had smoked a pack of cigarettes per day for the past 20 years. (Tr. 1078). Dr. Kohlhaas examined plaintiff and found that she walked with a normal gait; was able to move from a chair to an exam table and back without difficulty; moved her body to engage in

5

conversation without hesitancy or difficulty; was able to stand and move with no limitation; and

had some decreased range of motion in her spine. *Id.* Dr. Kohlhaas noted that a straight leg raise

test was negative, that plaintiff's complaints of numbness in her legs were not documented by an

EMG, and that she had normal sensation in her feet. *Id.* Dr. Kohlhaas diagnosed plaintiff with

spondylolisthesis without radiculopathy. *Id.* He agreed that plaintiff should continue seeing her

doctor quarterly for symptomatic treatment and take mild medication and opined that "she can

return to work since she's been caring for a 2-year old for almost the last year, with minimal

difficulty and has excellent range of motion and ability to move." *Id.* Dr. Kohlhaas further

opined that plaintiff's capabilities were in the high sedentary level, involving occasional lifting

up to 25-30 pounds, sitting, standing, walking, and bending and reported that she could return to

her old job, but may need to start with part-time work. (Tr. 1079).

An October 12, 2006 MRI of the lumbar spine showed little change from the September

2004 study, with continued grade I anterolistheses at L5-S1, with moderate to severe bilateral

foraminal narrowing persisting. This was interpreted as resulting in mass effect on both exiting

L5 nerve roots. Underlying bilateral spondylolysis was suspected. (Tr. 322).

Plaintiff was examined by Tammy Musolino, M.D., another treating physician[2], on

October 16, 2006. (Tr. 436-43). Dr. Musolino found plaintiff had some tenderness in the

midline L4-L5, mostly L5-S1. (Tr. 440). Range of motion was unchanged from previous

examinations and plaintiff had some spasm from L4 down to S1 bilaterally. *Id.* Plaintiff's

sensations subjectively decreased in the bilateral S1 distribution; her reflexes were symmetric

---

[2] Dr. Musolino is part of the Group Health Associates, the same practice as Dr. Wallace.

6

bilaterally; there was no ankle clonus or Hoffman's sign present; her tone was within normal limits throughout; her gait was nonantalgic; and plantar flexor response was down going bilaterally. *Id*. Dr. Musolino opined that plaintiff "has multiple reasons to have pain and problems. She does have pretty significant spondylolisthesis that is now causing mass effect on the bilateral L5 nerve roots. She does not wish to pursue surgery for this, so we will continue with working on conservative management." (Tr. 441). Dr. Musolino concluded that plaintiff could not return to work given the symptoms that she is having. *Id*.

Between January 2005 and September 2009, plaintiff received numerous trigger point injections to her lumbosacral region and her right knee. (Tr. 364, 373, 404, 420, 432, 482, 516, 1092, 1235, 1238).

An MRI taken on August 24, 2007, continued to document spondylolysis with grade 1 spondylolisthesis at L5-S1 with marked bilateral L5 foraminal stenosis. The radiologist noted that similar changes had been described dating back to at least 2004. (Tr. 366).

Willa Caldwell, M.D., reviewed plaintiff's medical records on behalf of the state agency in March 2008. (Tr. 1139-46). She opined that plaintiff could lift, carry, push and pull twenty pounds occasionally and 10 pounds frequently; sit about six hours in an eight hour workday; and stand/walk about six hours in an eight hour workday. (Tr. 1140). Dr. Caldwell also opined that plaintiff could frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently balance. (Tr. 1141). Dr. Caldwell determined that the severity and duration of plaintiff's symptoms were proportionate to the

7

expected severity and plaintiff's pain was taken into consideration. (Tr. 1144). W. Jerry McCloud, M.D., affirmed Dr. Caldwell's assessment in September 2008. (Tr. 1204).

Plaintiff underwent an EMG on December 12, 2008, which documented mild bilateral upper extremity median mononeuropathy (*i.e.*, carpal tunnel syndrome). (Tr. 1310-11). On January 19, 2009, Dr. Musolino instructed plaintiff to obtain wrist splints. (Tr. 1269).

In June 2009, plaintiff consulted with orthopaedic surgeon, Marc Wahlquist, M.D. (Tr. 1249-50). Plaintiff reported having trouble with her right knee for a couple of years, but stated the pain had worsened recently. (Tr. 1249). Plaintiff complained the pain was constant in the knee, mostly over the medial aspect of the knee, and sometimes on the anterior aspect of the knee. *Id*. She reported that the pain seemed to worsen with any kind of activity and that there was some clicking or popping noise. *Id*. Plaintiff related that she had received a cortisone injection which helped for about 3-4 days. *Id*. Dr. Wahlquist noted that x-rays taken that day demonstrated significant bone-on-bone arthritis of the medial compartment of the right knee with significant arthritis of the medial compartment of the left knee as well, but not quite bone-on-bone. (Tr. 1250-51). He also reviewed an MRI of the right knee that showed severe chondromalacia of the medial compartment with significant subchondral edema and also a meniscus tear. (Tr. 1251). Dr. Wahlquist opined that plaintiff's pain was most likely coming from her significant arthritis and started plaintiff on a series of Euflexxa injections.[3] *Id*.

---

[3] EUFLEXXA (1% sodium hyaluronate) is used to relieve knee pain due to osteoarthritis. It is used for patients who do not get enough relief from simple pain medications such as acetaminophen or from exercise and physical therapy. *See* http://www.euflexxa.com.

8

Plaintiff returned to Dr. Wahlquist on September 1, 2009 at which time he assessed that plaintiff's right knee arthritis had not improved with the Euflexxa injections. (Tr. 1235). Examination of the knee revealed: no effusion; significant tenderness along the medial joint line; pain with flexion past approximately 100 degrees; plaintiff had full extension and was able to get to approximately 120 degrees of flexion with pain; the medial collateral ligament was intact; the kneecap had slight crepitus and little tenderness with mobility; and plaintiff was able to ambulate without any assistive devices. *Id.* Dr. Wahlquist gave plaintiff a steroid injection to her right knee, prescribed diclofenac and Mobic for pain, and recommended an osteoarthritis (OA) knee brace to try and offload the medial compartment. (Tr. 1236).

On March 16, 2010, Dr. Musolino wrote a note to excuse plaintiff from jury duty, noting that she treated plaintiff for back problems including severe spondylolisthesis, severe degenerative disease and facet arthropathy, as well as fibromyalgia. Dr. Musolino recommended that plaintiff not participate in jury duty due to her inability to sit for prolonged periods of time due to the severity of her back condition. (Tr. 1221-22).

Dr. Wallace completed a residual functional capacity (RFC) questionnaire on April 22, 2010. (Tr. 1317-22). Dr. Wallace reported that she had been plaintiff's primary physician for the past seven years and saw plaintiff every 6 months. (Tr. 1318). She listed plaintiff's diagnoses as lumbar spondylolisthesis, lumbar stenosis, lumbar facet arthropathy, fibromyalgia, osteoarthritis, depression and carpal tunnel. *Id*. Plaintiff's prognosis was reported as poor. *Id*. Dr. Wallace noted that plaintiff suffered from lower back, knee, feet and ankle pain, described as sharp, severe and constant with stiffness and limited mobility. *Id*. Dr. Wallace reported that side

9

effects of medications included nausea, sedation, and decreased cognitive functioning, and that

Mobic caused renal insufficiency so plaintiff could not take NSAIDS for this reason. *Id*. She

noted that plaintiff's impairments were expected to last at least twelve months. *Id*. Dr. Wallace

estimated that plaintiff could not walk a city block and could sit or stand for only five minutes at

a time. (Tr. 1319). Dr. Wallace also found that plaintiff needed a period of walking around

during an 8 hour work day; to take unscheduled breaks about every 15 minutes for five minutes

at a time; and to elevate her legs above her waist 50% of the time. (Tr. 1319-20). Dr. Wallace

opined that plaintiff was limited to occasional lifting of less than ten pounds, was unable to do

any bending or twisting at the waist, and had significant limitations in her ability to do repetitive

reaching, handling, or fingering. (Tr. 1320). Dr. Wallace concluded that plaintiff would likely

miss work more than three times a month due to impairments or treatment. (Tr. 1321).

The following day, Dr. Musolino also completed a RFC questionnaire. (Tr. 1312-16).

Dr. Musolino reported that she first saw plaintiff in October 2004 and listed plaintiff's diagnoses

as lumbar spondylosis/spondylolisthesis, facet arthritis, osteoarthritis - knees, and bilateral leg

numbness. (Tr. 1313). Plaintiff's prognosis was noted as fair and plaintiff's impairments were

expected to last at least twelve months. *Id.* Dr. Musolino opined that plaintiff was unable to

walk a city block; could continuously sit and stand for only ten minutes at a time; and was

limited to sitting and standing/walking less than two hours total in an eight-hour day. (Tr. 1314).

Dr. Musolino also reported that plaintiff needs to elevate her legs above her waist 90% of the

time. (Tr. 1315). Dr. Musolino opined that plaintiff could not lift any weight, regardless of

10

frequency. *Id.* Dr. Musolino concluded that plaintiff was likely to be absent from work, as a result of her impairments or treatment, more than three times a month. (Tr. 1316).

At an April 23, 2010 follow up with Dr. Wahlquist plaintiff reported ongoing pain and associated ankle problems and noted that while the brace did help her knee feel better that it was uncomfortable and difficult to wear consistently. (Tr. 1326). Examination of the right knee revealed a small effusion; tenderness to palpation around the medial joint line; and an intact and opened medial collateral ligament. (Tr. 1327). Plaintiff also had tenderness in the right ankle and ambulated with a limp favoring the right side. *Id.* X-rays showed severe bone-on-bone arthritis of the medial compartment and Dr. Wahlquist opined that plaintiff would be a candidate for a partial knee replacement. *Id.*

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A) (DIB). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

11

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-

(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.*; *Wilson* v. *Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2. The claimant engaged in substantial gainful activity (SGA) during 2005. Earnings continued in 2006 and 2007. However, these amounts were lower than SGA levels.

3. The claimant has the following severe impairments: degenerative disc disease; irritable bowel syndrome; fibromyalgia; and depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform work activity, except as follows: She can occasionally lift 20 pounds and frequently lift 10 pounds. She can push/pull up to 10 pounds with hand or foot controls. She can sit for about 6 hours in an 8-hour workday. She can stand and/or walk for about 6 hours in an 8-hour workday. She should never use ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch or crawl. She can frequently balance or frequently use ramps or stairs. She is capable of simple, detailed, and some complex tasks, requiring not more than occasional contact with the general public, and no strict production quotas or time standards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).[4]

7. The claimant was born [in] 1962 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the

---

[4] Plaintiff has past relevant work as an administrative assistant and manufacturing coordinator. (Tr. 36-37).

claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2004, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-17).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

14

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff raises the following three assignments of error: (1) the ALJ erred in

failing to find that plaintiff's knee impairment and carpal tunnel syndrome were severe

impairments; (2) the ALJ erred in formulating plaintiff's RFC by not including the opinions of

treating physicians with respect to plaintiff's physical abilities; and (3) the ALJ erred in

discounting plaintiff's credibility and not giving full weight to her subjective complaints of pain

and other symptoms.

1. The ALJ erred in finding that plaintiff's knee impairment and carpal tunnel syndrome were not severe impairments.

Plaintiff asserts that the ALJ erred by not finding that her knee impairment and carpal

tunnel syndrome were not severe impairments at Step Two of the sequential disability analysis.

Further, plaintiff contends that the ALJ's failure to account for the limitations associated with

these impairments, as well as the complete exclusion of any mention of these impairments in his

decision, is reversible error in light of applicable regulations. Plaintiff's arguments are well-

taken.

A severe impairment or combination of impairments is one which significantly limits the

physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the

15

physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. § 404.1521(b)(1). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a *"de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers*, 486 F.3d at 243 n.2.

With respect to plaintiff's knee impairment/osteoarthritis, the Commissioner contends that the ALJ did not err in determining that plaintiff's right knee impairment was not severe by reasonably relying upon Dr. Kohlhaas' September 27, 2006 examination showing plaintiff walked with a normal gait, could move around the examination room without difficulty, and was able to stand and move without limitation. (Tr. 1078). This argument, as well as the ALJ's decision, completely ignores the objective record evidence demonstrating that plaintiff has bone-

16

on-bone osteoarthritis, first reported in 2008, and subsequent clinical findings and medical

opinions regarding plaintiff's decreased physical capabilities, all of which support a finding that

her knee impairment is severe.

In July 2008, plaintiff reported to Dr. Musolino that she was experiencing right knee

pain, without swelling, and she was advised to rest and ice her leg. (Tr. 1306). Plaintiff returned

in December 2008, again reporting right knee pain but also swelling and a grinding noise. (Tr.

1271). Dr. Musolino noted some crepitus in the patellofemoral joint of the right knee and mild

tenderness and ordered an x-ray. (Tr. 1272). The x-ray revealed no radiographic evidence of

effusion, but did demonstrate moderate bilateral medial joint space compartmental narrowing

and small marginal osteophytes; plaintiff was diagnosed with osteoarthritic degenerative

changes. (Tr. 1273). In follow-up visits in April and June 2009, plaintiff reported ongoing and

increasing pain and swelling in her right knee along with a popping sound. (Tr. 1260-62). Dr.

Musolino opined that plaintiff had arthritis in her knee after an x-ray revealed osteoarthritic

changes and a meniscal tear. *Id*. Plaintiff began treating with Dr. Wahlquist, an orthopedist, in

June 2009, and continued to report pain and swelling in the right knee. (Tr. 1250-51). Dr.

Wahlquist confirmed Dr. Musolino's diagnosis and opined that plaintiff had bone-on-bone

arthritis in the right knee. *Id*. Dr. Wahlquist unsuccessfully treated plaintiff with Eufflexa

injections and a knee brace, and after reviewing x-rays showing severe bone-on-bone arthritis of

her right knee, ultimately opined in April 2010 that plaintiff was a candidate for knee

replacement surgery. (Tr. 1236, 1240-43, 1325, 1327-28). Notably, Dr. Wahlquist reported that

he could continue with nonoperative management (more frequent use of the brace and injections)

17

but that "at this point [plaintiff]'s quality of life is so poor" she preferred surgery to the ongoing pain. (Tr. 1327).

As the Commissioner notes, after making the severity finding(s) at step two of the sequential analysis, when an ALJ considers all of a claimant's impairments in formulating the RFC, the failure to find additional severe impairments is not reversible error. *Maziarz v. Sec'y of H.H.S.*, 837 F.2d 240, 244 (6th Cir. 1987). Here, however, the ALJ did not consider the effects of plaintiff's knee impairment despite significant clinical and objective evidence of record establishing these conditions. Rather, the ALJ's decision is completely silent with respect to plaintiff's knee condition although there exists indisputable objective evidence that she has bone-on-bone arthritis of her right knee, lengthy treatment records including plaintiff's subjective complaints of pain, and medical opinions that plaintiff suffers from arthritis of the right knee. When an ALJ fails to mention relevant evidence in his decision, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Morris v. Sec'y of H.H.S.,* Case No. 86–5875, 1988 WL 34109, at * 2 (6th Cir. Apr. 18, 1988) (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). *See also Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review."). Because the ALJ failed to articulate any reasons for rejecting this evidence, the Court finds the ALJ's severity decision on this score is not supported by substantial evidence.

18

With respect to plaintiff's carpal tunnel syndrome, the Commissioner argues that the ALJ properly gave weight to Dr. Caldwell's March 26, 2008 opinion that plaintiff had no evidence of carpal tunnel syndrome. *See* Tr. 1141. Yet, similar to Dr. Kohlhaas, Dr. Caldwell generated this opinion prior to the existence of pertinent objective, clinical, and opinion evidence of record which clearly establishes that plaintiff suffers from carpal tunnel syndrome. *See* Tr. 1310 (December 12, 2008 EMG showing that plaintiff has mild bilateral upper extremity median mononeuropathy at the wrist (*i.e.*, carpal tunnel syndrome)); Tr. 1269, 1271 (November 2008 and January 2009 treatment notes from Dr. Musolino advising plaintiff to obtain wrist splints for carpal tunnel syndrome); Tr. 1320 (Dr. Wallace's April 2010 opinion that plaintiff is significantly impaired in her abilities to handle and manipulate); Tr. 1315 (Dr. Musolino's April 2010 opinion that plaintiff can only handle and manipulate objects for 10% of an eight-hour workday). Again, the ALJ failed to mention any of this evidence or even address plaintiff's carpal tunnel syndrome in his decision.

The Social Security Regulations provide that the ALJ is to "consider the combined effect of all of [the] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. Despite this mandate, the ALJ did not address the above highly relevant evidence regarding plaintiff's carpal tunnel syndrome and right knee impairment in failing to find either condition to be a severe impairment. Only in response to plaintiff's Statement of Errors does the Commissioner acknowledge the existence of these impairments and attempt to justify the ALJ's decision by citing to medical opinions that pre-date their onset. The Commissioner's arguments, like the ALJ's decision, fail

19

to address the relevant evidence which demonstrably supports a finding that plaintiff's knee impairment and carpal tunnel syndrome are more than "slight" abnormalities that affect her ability to work. *Farris*, 773 F.2d at 90.

Accordingly, the plaintiff's first assignment of error should be sustained.

2. The ALJ erred in weighing the medical opinions of record.

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)[5]; *Harris*, 756 F.2d 431. If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524,

_____

[5] Regulation 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion was previously found at § 404.1527(d).

20

528 (6th Cir. 1992).  The opinion of a non-examining physician is entitled to little weight if it is

contrary to the opinion of the claimant's treating physicians.  *Shelman v. Heckler*, 821 F.2d 316,

321 (6th Cir. 1987).  The "ALJ 'must' give a treating source opinion controlling weight if the

treating source opinion is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case

record.'"  *Blakley*, 581 F.3d at 406 (quoting *Wilson*, 378 F.3d at 544; 20 C.F.R. §

404.1527(c)(2)).  If the ALJ rejects a treating physician's opinion, the ALJ's decision must be

supported by a sufficient basis which is set forth in his decision.  *Walters*, 127 F.3d at 529;

*Shelman*, 821 F.2d at 321.

 If the ALJ does not give the treating source's opinion controlling weight, then the ALJ

must consider a number of factors when deciding what weight to give the treating source's

opinion.  20 C.F.R. § 404.1527(c).  These factors include the length, nature and extent of the

treatment relationship, the supportability of the opinion, the consistency of the opinion with other

evidence of record, and any specialization of the treating physician.  20 C.F.R. § 404.1527(c)(2)-

(6); *Wilson,* 378 F.3d at 544; *Blakley*, 581 F.3d at 406.  The ALJ must likewise apply the factors

set forth in § 404.1527(c)(3)-(6) when considering the weight to give a medical opinion rendered

by a non-treating source.  20 C.F.R. § 404.1527(c).

 In accordance with these requirements, the ALJ must give "good reasons" for the

ultimate weight afforded the treating physician opinion, based on the evidence in the record, and

the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision.

*Blakley*, 581 F.3d at 406-07 (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p,

21

1996 WL 374188, at *5[6]; *Wilson*, 378 F.3d at 544). The ALJ's failure to adequately explain the

reasons for the weight given a treating physician's opinion "*denotes a lack of substantial*

*evidence*, even where the conclusion of the ALJ may be justified based upon the record."

*Blakley*, 581 F.3d at 407 (emphasis in the original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 243 (6th Cir. 2007)).

Here, the ALJ determined, based largely on the opinions of consultative examiner Dr.

Kohlhaas and non-examining agency physician Dr. Caldwell, that plaintiff had the RFC to

perform a limited range of light work:

> [Plaintiff] has the [RFC to] occasionally lift 20 pounds and frequently lift 10
> pounds. She can push/pull up to 10 pounds with hand or foot controls. She can sit
> for about 6 hours in an 8-hour workday. She can stand and/or walk for about 6
> hours in an 8-hour workday. She should never use ladders, ropes, or scaffolds.
> She can occasionally stoop, kneel, crouch or crawl. She can frequently balance or
> frequently use ramps or stairs. She is capable of simple, detailed, and some
> complex tasks, requiring not more than occasional contact with the general public,
> and no strict production quotas or time standards.

(Tr. 13). In contrast, plaintiff's treating physicians, Dr. Wallace and Dr. Musolino, opined that

plaintiff's RFC precluded even sedentary work. *See* Tr. 1313-1321. Plaintiff argues that the

ALJ erred by not accounting for the limitations provided by Dr. Wallace and Dr. Musolino in

formulating plaintiff's RFC. As these are her treating physicians, plaintiff asserts their opinions

were entitled to greater weight and should have been reflected in the ALJ's RFC formulation.

---

[6] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of
the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and
interpretations' adopted by the Commissioner. 20 C.F.R. § 402.35(b)(1). In *Wilson*, 378 F.3d at 549, the court
refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same was as
Social Security Regulations, but *assumed* that they are. [The Court] makes the same assumption in this case."
*Ferguson v. Comm'r of Soc. Sec.*, 627 F.3d 269, 272 n.1 (6th Cir. 2010) (emphasis in original).

Plaintiff further contends that the ALJ erred in weighing the opinions of record as his decision fails to reflect that he properly considered the requisite factors enunciated in 20 C.F.R. § 404.1527(c). Moreover, plaintiff argues the ALJ erred in giving the greatest weight to the opinions of one-time consultative examiner Dr. Kohlhaas and the state agency reviewing physician Dr. Caldwell. For the reasons that follow, plaintiff's arguments are well-taken.

In his decision, ALJ McNeil gave "great weight" to Dr. Kohlhaas' 2006 assessment, "some weight" to Dr. Caldwell's opinion, and "some weight" to the opinions of Dr. Wallace and Dr. Musolino. (Tr. 16). The only explanation provided by the ALJ for discounting the opinions of plaintiff's treating doctors was that their assessments were "contradicted by the credible portion of the activities of daily living, which reflect greater capacities than reflected in the treating sources' assessments." *Id.* In light of the evidence of record, the ALJ's findings with regard to Dr. Wallace's and Dr. Musolino's opinions are not substantially supported.

First, the ALJ failed to sufficiently detail how "the credible portion" of plaintiff's reported daily activities reflect a greater capacity than that provided in the treating doctors' opinions. The complete absence of any citations to the evidence of record upon which the ALJ relies "denotes a lack of substantial evidence" and makes meaningful review of his decision an impossible task. *Blakley*, 581 F.3d at 407. Moreover, the record indicates that plaintiff reported extreme limitations in her abilities to sit, stand, and walk, which is consistent with the RFC assessments provided by Dr. Wallace and Dr. Musolino. *See, e.g.*, Tr. 39, 44, 55 (plaintiff's testimony that standing, walking, and sitting increases her pain, that she can't sit at a work station due to swelling and pain, and that she has to elevate her legs and recline to reduce the

23

swelling in her knees and ankles).  Consequently, the ALJ's decision to discount the opinions of

plaintiff's treating physicians by making an ambiguous reference to a portion of plaintiff's

reported daily activities is not substantially supported.

      Second, the ALJ provides no other reasons for only giving "some" weight to the

assessments of the treating physicians aside from this vague citation to a portion of plaintiff's

reported daily activities.  In fact, the ALJ's decision does not even acknowledge the April 2010

RFC questionnaires from Dr. Wallace and Dr. Musolino, plaintiff's treating physicians.  Given

the ALJ's silence, the Court "cannot tell if significant probative evidence was not credited or

simply ignored." *Morris v. Secretary of Health & Human Servs.,* Case No. 86–5875, 1988 WL

34109, at * 2 (6th Cir. Apr.18, 1988) (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d

Cir.1981)).  As a result of this omission, the ALJ committed an error law by not weighing the

treating doctors' opinions in accordance with 20 C.F.R. § 404.1527(c) or giving good reasons for

the ultimate weight given to such opinions. *Blakley,* 581 F.3d at 407.  Nevertheless, the

Commissioner argues that Dr. Wallace's April 2010 RFC assessment is inconsistent not only

with his concurrent examination findings, but with Dr. Musolino's RFC assessment as well, and

therefore the ALJ was fully justified in according only "some weight" to the decisions of the

treating doctors.  However, the Commissioner's post hoc rationalizations for the ALJ's actions

cannot supplant the ALJ's omission in this case. *Blakley,* 581 F.3d at 407.  The ALJ's failure to

address and discuss the treating physicians' RFC assessments requires remand to allow the ALJ

to fully consider these records. *See Bowen v. Comm'r of Soc. Sec.,* 478 F.3d at 750.

Third, as discussed *supra*, there is significant objective and clinical evidence regarding plaintiff's right knee impairment which supports the opinions of Dr. Wallace and Dr. Musolino. Specifically, x-ray evidence demonstrates that plaintiff has medial joint space compartmental narrowing and small marginal osteophytes, osteoarthritis changes, a meniscus tear and effusion in the right knee, and severe bone-on-bone osteoarthritis of the right knee. (Tr. 1260-62, 1273, 1327). Further, physical examinations by Dr. Musolino and Dr. Wahlquist include findings that plaintiff had crepitus in the patellofemoral joint of the right knee (Tr. 1235, 1272); tenderness and pain in the right knee area (Tr. 1243, 1250, 1257, 1262, 1272, 1307, 1327, 1343); and an antalgic gait (Tr. 1327). Plaintiff's treatment consisted of multiple steroid injections, resting and icing her knee, and the use of a knee brace; Dr. Wahlquist further opined that plaintiff was a candidate for knee replacement surgery. (Tr. 1236, 1240-43, 1325, 1327-28).

The ALJ failed to reference any of this evidence in his decision, citing only to evidence pre-dating the onset of plaintiff's right knee problems in which she was noted as not having any major extremity problems. *See* Tr. 13-14. The ALJ may not selectively reference a portion of the record which casts plaintiff in a capable light to the exclusion of those portions of the record which do not. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240-41 (6th Cir. 2002). However, here, that is precisely what the ALJ has done by failing to address the ample evidence of record supporting the opinions of Dr. Musolino and Dr. Wallace that plaintiff is significantly limited by her right knee impairment. As Dr. Musolino's and Dr. Wallace's opinions are supported by the objective medical evidence and are consistent with the record as a whole, their

25

opinions should have been given greater, if not controlling weight. *See* 20 C.F.R. §
404.1527(c)(3-4).

Lastly, the ALJ failed to weigh the opinions of record in accordance with the
requirements enunciated in 20 C.F.R. § 404.1527. Dr. Musolino treated plaintiff regularly since
2004 and Dr. Wallace has been plaintiff's primary care physician for seven years. (Tr. 1313,
1318). On the other hand, Dr. Kohlhaas examined plaintiff on one occasion in 2006 in order to
provide a medical opinion with regard to her physical ability to return to work. (Tr. 1077). Yet,
the ALJ discounted the opinions of plaintiff's treating physicians despite the significant length of
their treatment, the evidence supporting their opinions, such as findings and recommendations
from Dr. Wahlquist, and their consistency with the record as a whole. The ALJ failed to address
any of these relevant factors and discounted the opinions stating simply that were contradicted by
"the credible portion of [plaintiff's reported] activities of daily living, which reflect greater
capacities than reflected in the treating sources assessments." (Tr. 16). The ALJ does not
identify what reported daily activities are inconsistent with the RFC assessments of Dr. Musolino
and Dr. Wallace (except to say that it is the portion he finds credible) leaving the Court to guess
as to what the ALJ was referring. The ALJ's failure to adequately explain the reasons for the
weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where
the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407
(emphasis in the original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir.
2007)).

26

Though there are instances where such "procedural violation[s] may constitute harmless error, such as when 'a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it' or where the Commissioner 'has met the goal of . . . the procedural safeguard of reasons[,]'" this is not one of them. *Fisk*, 253 F. App'x at 586 (quoting *Wilson*, 378 F.3d at 547). The Court is unable to engage in "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544, because it is not "sufficiently specific to make clear" to the Court that the ALJ considered the medical opinions of record in accordance with the applicable regulations. SSR 96-2p, 1996 WL 374188, at *5. Nor were plaintiff's treating physicians' opinions "so patently deficient that the Commissioner could not possibly credit it." *Wilson,* 378 F.3d at 547. While it is true, as the Commissioner notes, that there are variations between the treating physician's RFC assessments, they are supported by evidence not acknowledged by the ALJ and are consistent to the extent that both doctors opined that plaintiff is incapable of full-time employment as a result of her physical impairments.

The ALJ provided no explanation for not addressing the evidence of record regarding plaintiff's knee impairment/osteoarthritis and further failed to identify the portion of plaintiff's reported daily activities that prompted him to give the most weight to a one-time examining doctor whose opinion was rendered years before plaintiff was diagnosed with osteoarthritis of the knee. These omissions leave the Court unable to discern the ALJ's reasons for discounting the opinions of Dr. Wallace and Dr. Musolino; accordingly, remand is appropriate. The ALJ should have complied with the requirements of § 404.1527(c)(2) and provided an explicit basis, including giving "good reasons," for not adopting the RFC assessments of plaintiff's treating

27

doctors. *See Wilson*, 378 F.3d at 545. By failing to do so, the ALJ deprived this Court of the ability to conduct a meaningful review of the decision. *Id*. at 544. Further, the ALJ erred in formulating plaintiff's RFC based on Dr. Kohlhaas' opinion without acknowledging its limited nature. Consequently, plaintiff's second assignment of error should be sustained.

3. The ALJ erred in determining that plaintiff was not fully credible.

For her final assignment of error, plaintiff asserts the ALJ erred in finding that she was not fully credible. The ALJ's credibility decision must include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v.*

28

*Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky v. Bowen*, 35 F.3d 1027, 1039-41 (6th Cir. 1994).

At the hearing, plaintiff testified that she had been a long-term employee at Proctor & Gamble and had taken time off for depression but experienced a significant flare up of back pain 2004 just after she was getting back to full-time work. (Tr. 36- 38). Plaintiff recounted that her back pain has consistently remained high and is worsened by standing, walking, or sitting too long and she currently is only able to manage her pain, but not reduce or eliminate it. (Tr. 39). Plaintiff further testified that conservative treatment, such as physical therapy and steroid injections, have failed to alleviate her back pain and explained that she declined back surgery based on her surgeon's representations that the procedure was highly invasive and debilitating and that there was no guarantee it would cure her pain. (Tr. 40-41). Plaintiff stated that her back pain is constantly at a level of five to six out of ten and is focused in her lower back. (Tr. 42).

Regarding her extremity pain, plaintiff testified that she experiences significant pain, which she rated at a seven or eight, and swelling in her legs which requires her to use a leg brace, recline, and elevate her legs for a significant portion of her day. (Tr. 44-47). Plaintiff stated that she is incapable of most physical activity and is only able to do housework in short spurts, needing to rest after each activity. (Tr. 48-49). Plaintiff also testified that she experiences pain and numbness in her right hand due to carpal tunnel syndrome which limits her ability to use the computer or talk on the phone. (Tr. 53).

29

With respect to daily activities, plaintiff testified that she is occasionally able to drive her daughter to school, which is five minutes away, and possibly go out to dinner on a good day, but otherwise her social life is significantly limited. (Tr. 50). Plaintiff stated that she is able to go shopping for a few items, but that she uses a motorized cart while at the store or is assisted by her 13 year old child because she is unable to reach and lift things from the shelves. (Tr. 55). Under questioning by her attorney, plaintiff testified about an April 27, 2008 treatment note that indicated that plaintiff had found it difficult to come in for a doctor's visit because she had been babysitting. (Tr. 62). Plaintiff explained that the note was inaccurate and that she had not been babysitting but, rather, had been having difficulty finding a babysitter. *Id*.

The ALJ found that the alleged severity and debilitating nature of plaintiff's subjective complaints were not fully credible to the extent they were not consistent with the RFC he formulated. (Tr. 13). The ALJ identified the following to support his credibility determination: (1) plaintiff's complaints were not consistent with the objective medical evidence of record; (2) plaintiff's reported daily activities were not consistent with her allegations regarding the severity of her pain; and (3) plaintiff was non-compliant with treatment recommendations. For the following reasons, the undersigned finds that the ALJ's credibility determination is not substantially supported by the evidence of record.

To support his finding that the medical evidence is inconsistent with plaintiff's allegations about the severity level of her impairments, the ALJ identified treatment notes that plaintiff had no significant neurological or strength test findings; negative straight and cross leg raise testing; none to slight gait problems; no major extremity problems; mild to moderate

30

lumbar tenderness and spasm; occasional lumbar restrictive range of motion; the ability to heel and toe walk and deep knee bend without difficulty; normal deep tendon reflexes; and no major problems with sensor testing. Notably, the ALJ cited to several exhibits in the record containing treatment notes from 2001 to 2010, over 900 pages of records, many of which pre-date the onset of plaintiff's osteoarthritis and carpal tunnel syndrome, without providing specific page references to the treatment notes supporting his finding. As a consequence, the undersigned is unable to determine what evidence the ALJ relied on in determining that the medical evidence of record is not consistent with plaintiff's allegations regarding her back, knee, and wrist conditions.

The ALJ is required to provide "sufficiently specific [reasons supported by the evidence in the case record] to make clear to . . . any subsequent reviewers[,]" the rationale behind his credibility determination. Yet, here, the ALJ simply cited to nearly 1,000 pages of medical records. However, these records, especially those generated subsequent to the onset of plaintiff's osteoarthritis and carpal tunnel syndrome, contain ample notations from plaintiff's treating physicians, discussed *supra*, which support her subjective reports of pain and limited physical ability. Indeed, the ALJ noted that the objective evidence of record included documented lumbar MRI and EMG findings (albeit he failed to identify the documented x-ray findings of plaintiff's right knee osteoarthritis[7]), as well as numerous steroid injections, but, despite this objective evidence supporting her subjective statements, determined the plaintiff was not fully credible.

---

[7] The ALJ is required to consider the entire case record in determining an individual's credibility. *See* SSR 96-7p, 1996 WL 374186, at *1-2 (July 2, 1996).

As there is significant evidence of record supporting plaintiff's subjective complaints, and given

that the ALJ failed to cite to "sufficiently specific" evidence of record contradicting these

complaints, the undersigned finds that the ALJ's credibility determination in this regard is

without substantial support.  Moreover, reversal is required as the ALJ failed to consider the

entire case record as required by Ruling 96-7p.  *Wilson*, 378 F.3d at 544 (even where substantial

evidence otherwise supports an ALJ's decision, reversal is required where the agency violates its

own procedural regulation).  The ALJ failed to acknowledge the objective and clinical evidence

regarding plaintiff's osteoarthritis and carpal tunnel syndrome in making his credibility

determination despite the requirement that he take this evidence into account.  Consequently, the

ALJ's credibility determination should be reversed and remanded with instructions to consider

the entirety of the case record and to provide "sufficiently specific" supporting evidence.

The ALJ further justified discounting plaintiff's credibility by determining that her

reports about the severity of her impairments were inconsistent with her reported daily activities.

In particular, the ALJ identified evidence that plaintiff: speaks with friends on the telephone;

sees friends monthly[8]; watches television; listens to music; works on the computer; is sexually

active; babysits; and exercises on a treadmill and bike several times a week.  (Tr. 15).  The

evidence cited by the ALJ includes notations in plaintiff's medical records, plaintiff's testimony

and statements made by plaintiff in her symptoms report.  *See* Tr. 50, 53, 224, 1177, 1288, 1336.

The August 2008 Function Report includes plaintiff's statements that she uses the computer but

---

[8] After an extensive review of the record, the undersigned is unable to find any evidence supporting the
ALJ's findings that plaintiff sees her friends on a monthly basis or regularly listens to music.

can only sit for 15-20 minutes at a time. (Tr. 224). Further, plaintiff reported that she speaks with her friends daily on the phone, *id.*, but at the ALJ hearing she explained that being on the phone and using computer causes pain and numbness in her hands after about five minutes. (Tr. 53). Further, as stated *supra*, plaintiff testified that she had not done any babysitting (Tr. 62) and that she spent most of the day in her recliner watching television. (Tr. 50). Lastly, in November 2008 plaintiff reported that she had been regularly exercising on a treadmill and bike, but also that the exercise had been increasing her back pain. (Tr. 1287-88). Notably, the record is silent with respect to how long and with what intensity plaintiff was engaging in exercise and the ALJ did not elicit any testimony from plaintiff in this regard.

The ALJ's determination that plaintiff's credibility is undermined by her reported daily activities fails to take into account the manner in which she accomplishes these tasks. As noted above, plaintiff is only able to speak on the phone and use the computer for five minutes before she experiences pain and numbness in her wrists and is unable to sit at the computer for more than 20 minutes at a time. Further, plaintiff's hearing testimony reasonably explains that she was not babysitting but, rather, looking for a babysitter; yet, the ALJ failed to acknowledge her explanation. To the extent that plaintiff engages in sexual activity or had attempted to engage in exercise, the record does not contain sufficient facts from which one could infer that these activities are inconsistent with plaintiff's allegations of pain. Lastly, it is unclear how plaintiff's ability to watch television in a reclined position is inconsistent with her reports that she often needs to recline in order to relieve the pain in her back and lower extremities. The ALJ's selective citations to plaintiff's reported daily activities do not fairly portray her physical

33

abilities. Although the ALJ was not bound to accept plaintiff's statements about her physical

limitations, he was obligated to take into account the medical evidence and plaintiff's reported

methods for dealing with her pain, *i.e.*, her need to recline and the limited time in which she

engages in activities such as speaking with friends or using the computer. The ALJ failed to do

so in this case and, consequently, his decision in this regard is not substantially supported.

The ALJ's final basis for discrediting plaintiff was that she was non-compliant with

treatment recommendations, namely recommendations to engage in aquatic therapy; refusal of

surgery and certain medications; failure to follow-up on getting a TENS unit[9]; not losing weight;

not exercising as recommended; not quitting smoking; and not engaging in a sleep study. Again,

the ALJ failed to address relevant evidence of record in making this finding. Social Security

Ruling 96-7p states that "the adjudicator must not draw any inferences about an individual's

symptoms and their functional effects from a failure to seek or pursue regular medical treatment

without first considering any explanations that the individual may provide, or other information

in the case record, that may explain infrequent or irregular medical visits or failure to seek

medical treatment." *See* SSR 96-7p, 1996 WL 374186, at *1-2. Plaintiff testified at the hearing

that she had had not gotten the back surgery because of its invasive nature and potentially limited

benefits (Tr. 41) and that she did not take certain pain medications because of their side effects.

(Tr. 42, 52, 67). She also testified that she was in the process of scheduling a sleep study (Tr.

52) and explained that she was gaining weight because it was painful to move. (Tr. 56). The

---

[9] Contrary to the ALJ's finding, treatment records from Dr. Musolino indicate that plaintiff did use a TENS unit. *See* Tr. 1162.

34

ALJ's failure to mention any of plaintiff's explanatory testimony contravenes the requirements of SSR 96-7p.  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence . . . .'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Blakley*, 581 F.3d at 407).  Given the reasonable explanations provided by plaintiff for not following certain treatment recommendations and the lack of any indication from the ALJ that he considered such explanations in accordance with 96-7p, his decision to discount plaintiff's credibility on this basis is not substantially supported.

There is no evidence of record which speaks directly to plaintiff's failure to quit smoking or engage in aquatic therapy.  While plaintiff may not have complied with these recommendations, this is not, standing alone, a sufficient basis for discounting plaintiff's credibility.

In addition, the ALJ's decision failed to include consideration of all the requisite factors in determining if plaintiff's subjective complaints of pain are credible.  Specifically, the ALJ did not address: (1) the location, duration, frequency, and intensity of the plaintiff's pain or symptoms; (2) factors that precipitate and aggravate the symptoms; or (3) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); SSR 96-7p.  The ALJ's failure to adhere to the requirements of these rules and regulations demonstrates that his credibility finding is without substantial support in the record.  *Cole*, 661 F.3d at 937 (citing *Blakley*, 581 F.3d at 407).  Accordingly, plaintiff's third assignment of error should be sustained.

35

## IV. Conclusion

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that remand is appropriate where the ALJ failed to consider evidence of record. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Here, the ALJ failed to consider evidence of plaintiff's right knee osteoarthritis and carpal tunnel syndrome. In addition, the current record does not adequately establish plaintiff's entitlement to benefits as of her alleged onset date. Accordingly, this matter should be remanded for further proceedings, including reassessment of whether plaintiff's right knee problems and carpal tunnel syndrome are severe impairments; reconsideration of the opinions of Dr. Wallace and Dr. Musolino; reassessment of plaintiff's RFC; and redetermination of plaintiff's credibility taking into account reasonable explanations for not following certain recommended treatments.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 7/6/2012

Karen L. Litkovitz
United States Magistrate Judge

36

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KIMBERLY CROWTHER,                                  Case No. 1:11-cv-394
      Plaintiff,                                 Barrett, J.
                                                    Litkovitz, M.J.

      vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).